IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **MATTHEW HOWELL and ALISHA BROWN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **NO. 3:15-cv-01428** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **JUSTIN MCCORMICK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court are four motions for summary judgment (Doc. Nos. 245, 249, 251, 260) filed by Defendants Metropolitan Government of Nashville and Davidson County ("Metro"), Justin McCormick, Luis Lopez Aldea, Wallis Massey, James Jenson, and Daniel Polk (collectively the "Officers") and Joshua Vaughn. The motions are fully briefed and ripe for resolution. (*See* Doc. Nos. 275, 280, 284, 285). For the reasons discussed below, the motions will be **GRANTED** as to Plaintiffs' federal claims.

## I.      FACTUAL BACKGROUND

This case arises from the warrantless seizures of Plaintiffs Matthew Howell, Alisha Brown, and Howell's vehicle on December 9, 2014. Howell and Brown bring the present action under 42 U.S.C. § 1983, alleging violations of their Fourth Amendment rights, violation of Howell's Fifth Amendment Rights, and state law claims of conversion, trespass, battery, and false arrest. (*See* Amended Complaint, Doc. No. 72). At all relevant times, Howell and Brown co-owned and lived together in a residence located in Davidson County, Tennessee ("the residence"). Defendant Leila Avila briefly rented a room at the residence.

*December 9, 2014*

On December 9, 2014, Metropolitan Nashville Police Department ("MNPD") officers responded to an emergency dispatch to the residence. (Doc. No. 276 ¶ 3 at PageID # 1545). The information first relayed by the dispatch operator informed the officers of a domestic disturbance involving a man with a gun. (*Id*. ¶ 4 at PageID # 1546). The suspect was described as the victim's roommate named Matt Howell. (*Id*.). Dispatch was also informed that Howell was intoxicated and had pointed a gun at the victim. (*Id*.). The dispatcher assigned the emergency a Code 3 and advised that the caller would be standing in the street. (*Id*.). A Code 3 emergency is the highest level of priority that the dispatcher may assign to an emergency response. (*Id*. ¶ 6 at PageID # 1546). Dispatch sent a second radio transmission that informed the officers that another female was in the home. (*Id*. ¶ 5 at PageID # 1546). Consistent with a Code 3 life threatening emergency, MNPD officers responded by driving their patrol vehicles in full emergency mode to the scene. (*Id*. ¶ 7 at PageID # 1547).

Vaughn was the first officer to arrive on the scene. (*See* Doc. No. 277-3 at PageID # 1598, 1648). When McCormick and Jenson arrived, Massey, Aldea, and Vaughn were already standing with Avila outside. (Doc. No. 276 ¶¶ 8, 9 at PageID # 1547; Doc. No. 277-3 at PageID # 1650, 1684-85; Doc. No. 254-2 ¶ 4). McCormick could see that Avila was unnerved and shaking. (Doc. No. 276 ¶ 9 at PageID # 1547). Massey told McCormick that Avila had confirmed that her roommate, Howell, had pointed a gun at her. (*Id*. ¶ 10 at PageID # 1547).

McCormick then left Avila with Massey and Jenson and approached the front door of the residence with Vaughn and Aldea in tow. (Doc. No. 276 ¶ 13 at PageID # 1548; Doc. No. 277-3 at PageID # 1600, 1682, 1688). When the front door opened, Howell was standing in the doorway. (Doc. No. 276 ¶ 15 at PageID # 1549). Howell refused McCormick's requests to enter the residence

and pat him down for weapons. (Doc. No. 276 ¶ 17 at PageID # 1549; Doc. No. 277-1 ¶¶ 3, 5; Doc. No. 277-2 ¶¶ 3, 5). Howell informed McCormick that there were weapons in the house but denied having any weapons on his person. (Doc. No. 276 ¶¶ 19, 20 at PageID # 1550). McCormick was not able to see if Howell was armed or what objects or weapons were within Howell's reach within the residence. (Doc. No. 276 ¶ 21 at PageID # 1550-51).

McCormick was able to see a female standing to Howell's left and asked her to step outside and talk. (Doc. No. 276 ¶ 22 at PageID # 1551). Howell told the female not to go out of the house. (*Id*.). Howell continued to stand in the doorway and refused to step out of the doorway onto the porch. (Doc. No. 276 ¶ 23 at PageID # 1551). Howell informed the officers that he had not done anything wrong and to contact his attorney. (Doc. No. 277-1 ¶¶ 3, 5; Doc. No. 277-2 ¶¶ 3, 5). McCormick then grabbed Howell's hand in a martial-arts style maneuver and the other officers at the front door, Vaughn and Aldea, pushed Howell into an interior wall while his arm was still twisted around. (Doc. No. 277-2 ¶ 5; Doc. No. 276 ¶¶ 14, 26 at PageID # 1541, 1552; Doc. No. 277-3 at PageID # 1612, 1614; Doc. No. 277-4 at PageID # 1707). After Howell was handcuffed, McCormick and Vaughn escorted Howell to McCormick's patrol vehicle, where Howell was patted down and seated inside. (Doc. No. 276 ¶¶ 43, 47 at PageID # 1558-59; Doc. No. 277-3 at PageID # 1622). Detective Polk arrived at the scene during Howell's escort to McCormick's patrol vehicle. (Doc. No. 276 ¶ 47 at PageID # 1559; Doc. No. 254-2 ¶ 11). Vaughn stood in front of McCormick's patrol vehicle, while McCormick and Detective Polk questioned Howell in the patrol vehicle. (Doc. No. 277-3 at PageID # 1623-24; Doc. No. 276 ¶ 16 at PageID # 1542).

Vaughn, Detective Polk, and McCormick then approached the front door and questioned Brown for approximately ten minutes before handcuffing her for not being cooperative. (Doc. No. 277-1 ¶¶ 8-14). Officers took Brown outside into the driveway while she was handcuffed, in full

view of any neighbors who might have been watching. (*Id.* ¶¶ 14, 16). Officers kept Brown handcuffed for about 30 to 45 minutes while Jensen, Massey, and Avila went inside the residence. (Doc. No. 277-1 ¶¶ 14-16; Doc. No. 254-2 ¶¶ 17-24; Doc. No. 277-6 at PageID # 1747). McCormick charged Howell with aggravated assault under Tennessee Code Annotated Section 39-13-102 and resisting a frisk under Tennessee Code Annotated Section 39-16-602. (Doc. No. 254-1 ¶ 33; Doc. No. 278-1). After the officers left the scene, the vehicle at issue was either still on the property or on the street in front of the residence. (*See* Doc. No. 276 ¶ 25 at PageID # 1544).

*Howell's Complaint*

A week after the incident on December 9, 2014, Howell tried to report his vehicle as stolen by Avila and MNPD officers. (Doc. No. 277-2 ¶¶ 13-14). Although a MNPD officer came to Howell's residence in response to the report, the officer was dismissive of Howell and took no action. (*Id.* ¶ 13). After that, Howell tried filing an official, written complaint with Internal Affairs. (*Id.* ¶ 14). According to Howell, MNPD "now pretends that it never received any verbal or written complaints from [him]." (*Id.*). At the end of 2015 or beginning of 2016, the Office of Professional Accountability left a voicemail for Howell's attorney but never interviewed Howell about his complaint. (*Id.* ¶ 15). Howell later found out that the Office of Professional Accountability had opened a file in response to his complaint but closed it the same day. (*Id.*; Doc. No. 278-4).

*The Prosecution*

A preliminary hearing was held on March 11, 2015, where Avila was the sole witness. (Doc. No. 254-6). In April 2015, the Davidson County Grand Jury charged Howell with one count each of resisting arrest and aggravated assault by causing Avila to fear bodily injury by use or display of a deadly weapon. (Doc. No. 278-3). The criminal jury trial took place in February 2016.

4

McCormick, Polk, Vaughn, Massey, Jensen, Howell, and Brown each testified at the trial. (*See* Doc. No. 277-4 at PageID # 1694-99). Polk's trial testimony included the following:

> Q.  Okay. And explain to us a little bit about warrants. In other words, is a police officer typically allowed to arrest someone in his home without a warrant?
>
> A.  If a police officer has probable cause to believe that a crime has been committed, yes.
>
> Q.  And that's what they teach y'all at your police department?
>
> A.  Yes, sir.
>
> Q.  Why did you make it a point to point out that you yourself never stepped to any significant amount into the house?
>
> A.  I didn't step a significant amount into the house. I just walked inside the door. There was a police officer in there so I wanted to make sure, because no one had been in there, that the scene was secure and he was not in there by himself.

(Doc. No. 277-5 at PageID # 1739). The jury acquitted Howell of both aggravated assault and resisting arrest but found him guilty of reckless aggravated assault. *See State v. Howell*, No. M201601812CCAR3CD, 2018 WL 385505, at *5-6 (Tenn. Crim. App. Jan. 11, 2018). The trial court amended the jury's verdict to that of simple assault because Avila suffered no bodily injury. *See id*. The Tennessee Court of Criminal Appeals subsequently determined that "when the trial court amended the defendant's conviction to simple assault, it did so in violation of the defendant's protection against double jeopardy because simple assault is an offense that requires an intentional or knowing mental state and specifically excludes the mens rea of recklessness." *Id*. at *7. The state appellate court held "that a new trial on the offense of simple assault is barred by double jeopardy and collateral estopped principles." *Id*. at *9. And because there were no other available lesser-included offenses, the appellate court vacated the trial court's judgment convicting Howell of assault and dismissed the case. *Id*.

*MNPD Training*

MNPD officers receive training in the police academy as to constitutional issues that may arise during the performance of their duties. (Doc. No. 276 ¶ 5). They also receive periodic in-service training and roll call updates as to any case law that may affect the performance of their duties. (*Id*.). Additionally, the MNPD manual requires officers to keep up to date with any legal issues that may arise in the performance of their duties as applied to criminal matters. (*Id*.).

Any constitutional issues related to an officer's performance of duties can be reported by the District Attorney's Office or by a superior officer. (*Id*. ¶ 6). Additionally, there are MNPD policies in place to review case quality. (*Id*.). MNPD policy also provides for the District Attorney's Office to report an officer when a case has been dismissed due to police mishandling and for the matter to be reviewed by Case Preparation personnel. (*Id*.). MNPD officers receive domestic violence training as part of basic training as well as periodic updates. (*Id*. ¶ 7). Additionally, MNPD officers receive training regarding exigent circumstances in the context of domestic violence. (*Id*. ¶ 8). The MNPD Manuel in effect in 2014 provides that:

> Consistent with the U.S. Supreme Court's holding in *Payton v. New York*, it is presumptively unreasonable for Metropolitan Nashville Police Officers to make a non-consensual warrantless entry into a suspect's home for the purpose of making a routine felony arrest. However, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter the dwelling in which the suspect lives when there is reason to believe the suspect is within.

(Doc. No. 254-9 at PageID # 1308 (citing *Payton v. New York*, 445 U.S. 573 (1980); Doc. No. 276 ¶ 10 at PageID # 1569). The Manual further provides that officers should wait until invited to enter a property unless there is probable cause to enter the property which can include ensuring the safety of a potential victim. (Doc. No. 276 ¶ 7). Additionally, the Manual provides that officers should arrest a suspect in response to a domestic violence call only after they have determined

6

there is probable cause. (*Id*.). The Manual addresses making non-consensual entry into a suspect's home for the purposes of making an arrest and when officers are permitted to enter an individual's property without a warrant in the context of domestic violence. (*Id*. ¶ 8).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case.  *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party.  *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).  The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question.  *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party.  *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

7

### III.    LAW AND ANALYSIS

**A.    Qualified Immunity**

Through their pending motions, the Officers and Vaughn seek summary judgment on qualified immunity grounds. "Qualified immunity shields officers from civil liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *King v. City of Rockford, Michigan*, 97 F.4th 379, 390 (6th Cir. 2024) (citation and internal quotations omitted). Summary judgment based on qualified immunity is appropriate unless the evidence viewed in the light most favorable to the plaintiff would permit a reasonable juror to find that: (1) the defendant violated a constitutional right, and (2) the right was clearly established. *See id*. "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018). When a defendant asserts the defense of qualified immunity, the plaintiff has burden of showing that the defendant is not entitled to qualified immunity. *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024).

To be clearly established for qualified immunity purposes, "a legal principle must have a sufficiently clear foundation in then-existing precedent." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1009 (6th Cir. 2024) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)). In the context of a warrantless arrest, a "clearly established" rule, for qualified immunity purposes, must resolve whether the circumstances with which the particular officer was confronted constituted probable cause. *Wesby*, 583 U.S. at 64. "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id*. at 56–57 (internal quotations omitted). Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even

usefully, reduced to a neat set of legal rules. *Id*. at 57 (internal citations and quotations omitted). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered." *Id*. at 64 (citation and internal quotations omitted). "Thus, [the Supreme Court] ha[s] stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id*. "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate" such that "a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." *Id*. (citations and internal quotations omitted).

1.  Count One

In Count One, Howell and Brown claim Vaughn, McCormick, Aldea, and Polk violated their Fourth Amendment rights to be free from unreasonable searches and seizures. (*See* Amended Complaint, Doc. No. 72 ¶¶ 48-66). Howell and Brown argue the law was clearly established as of December 2014 that an unsubstantiated 911 call did not create probable cause for an arrest. (*See* Doc. No. 275 at 1, 11-15). In support, Howell and Brown cite to *Illinois v. Gates*, 462 U.S. 213 (1983) and *Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005). Both of these cases are inapposite. In *Illinois v. Gates*, the Supreme Court considered the application of the Fourth Amendment to the issuance of a search warrant based on a partially corroborated anonymous informant's tip. 462 U.S. 213, 217 (1983). There, the police had received an anonymous letter stating that a husband and wife were engaged in selling drugs, had over $100,000 worth of drugs in their basement, and that they were picking up more drugs in Florida in a few days. *See id*. at 213. The police acted on the tip by arranging for surveillance of the couple's travel arrangements and then obtained a search

warrant based on the foregoing facts. *See id*. When the couple arrived at their home, the police were waiting and discovered drugs and other contraband in the couple's car and home. *See id*. The Supreme Court determined that the judge issuing the warrant had a substantial basis for concluding that probable cause to search the couple's home and car existed because the anonymous letter had been corroborated through the police's independent investigation. *See id*. at 242-46, 214 ("Under the 'totality of the circumstances' analysis, corroboration by details of an informant's tip by independent police work is of significant value.").

*Fisher v. Harden* concerned a seizure based on an attempted suicide. In that case the Sixth Circuit considered "whether it was clearly established at the time of Fisher's arrest that a law enforcement officer may not affect a mental health seizure without probable cause." 398 F.3d 837, 846 (6th Cir. 2005). The officers in *Fisher* were responding to a dispatch that a man, who had tied himself to railroad tracks, might be attempting to commit suicide. *See id*. at 843. When the officers arrived, Fisher, who was not tied to the railroad tracks, complied with their orders and "did not do anything that the officers considered to be suspicious or threatening." *Id*. And the Sixth Circuit determined it was "clearly established that an officer may not affect a mental health seizure without probable cause." *Id*. at 849.

Neither *Illinois* nor *Fisher* are cases "where an officer is acting under similar circumstances was held to have violated the Fourth Amendment." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018). The officers in *Illinois* and *Fisher* were not responding to a domestic disturbance call, as in the present case. Nor were the officers in *Illinois* and *Fisher* responding to a 911 call from a contemporaneous eyewitness, as in the present case. Because firsthand knowledge and contemporaneity weigh in favor of a statement's reliability, courts in the Sixth Circuit distinguish a 911 call from a contemporaneous eyewitness account as more reliable than a 911 call from an informant with less

proximity in time and space to the reported criminal activity. *See Robinson v. Howes*, 663 F.3d 819, 829-30 (6th Cir. 2011) (citing cases); *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006) ("hearsay may be sufficient to establish probable cause for purposes of issuing a warrant, so long as a substantial basis for crediting the hearsay is presented.") (internal quotations omitted).

In sum, Howell and Brown have failed to direct the undersigned to a case directly on-point or existing precedent placing the lawfulness of the challenged searches and seizures beyond debate. *See Wesby*, 583 U.S. at 64. As such, they have failed to meet their burden of establishing the Officers and/or Vaughn are not entitled to qualified immunity as to Count One. Therefore, these defendants' motions will be granted as to Count One on qualified immunity grounds.

2. <u>Count Two</u>

In Count Two, Howell claims McCormick, Aldea, Massey, Jenson, and Polk violated his Fourth Amendment right to be free from unreasonable seizure of property. (*See* Amended Complaint, Doc. No. 72 ¶¶ 67-71).[1] In response to these officers' claims of qualified immunity for Count Two, Howell merely submits that "seizing a vehicle may constitute a Fourth Amendment violation, if done unreasonably." (Doc. No. 275 at 32 (citing *Collins v. Nagle*, 892 F.2d 489, 493-94 (6th Cir. 1989)).

In *Collins v. Nagle*, the Sixth Circuit held that, in analyzing whether the seizure of a vehicle was proper under the Fourth Amendment, a court must determine whether the "decision to impound was reasonable under the circumstances." 892 F.2d 489, 494 (6th Cir. 1989) (citing *Cooper v. California*, 386 U.S. 58, 59 (1967)). *Collins* concerned the impoundment of a truck in connection with a mining investigation:

> The facts and circumstances surrounding the impoundment are numerous. An unidentified pickup truck was blocking the mining

---

[1] Howell also has claims against Vaughn that are addressed separately. *See infra* III.B.

investigators' exit from the site where they were investigating a suspected illegal mining operation. M. Collins and Fultz were present when the mining investigators tried to leave and stated that they did not have the keys to the truck. At no other point during the incident did anyone claim to be able to move the truck. Since Martin, Riddle and Brown had seen M. Collins and Fultz in the truck on numerous occasions, it was reasonable to believe that they had custody and control of the pickup. B. Collins appeared on the scene during the arrest. However, he did not identify himself to the mining investigators; and he did not indicate that he had dominion and control over the truck. Before following Brown's order to leave the scene, B. Collins merely claimed that he had a right to be on the premises. It was only after taking the truck into custody that the mining investigators traced the registration and discovered that Maggie Collins, B. Collins' wife, was the true owner of the truck.

Thus, once the mining investigators decided to arrest M. Collins and Fultz, they were faced with the problem of securing the truck. We find that the impoundment was a reasonable, albeit unsuccessful, means to insure against the damage or theft of the abandoned truck, as the mining investigators knew of no other person immediately available to take custody of the vehicle. Brown, 787 F.2d at 932.

*Collins v. Nagle*, 892 F.2d 489, 494 (6th Cir. 1989).

In the present case, the Officers did not impound the vehicle at issue. As such, *Collins* is not on-point or helpful in resolving the issue of qualified immunity as to Count Two. Because *Collins* was the only case identified by Howell to meet the "clearly established" prong of the qualified immunity analysis, he fails to meet his burden of establishing that McCormick, Aldea, Massey, Jenson, and Polk are not entitled to qualified immunity as to Count Two. *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024). Therefore, the Officers' motion for summary judgment will be granted as to Count Two on qualified immunity grounds.

3.     Count Three

In Count Three, Howell claims McCormick violated his Fourth Amendment right to be free from seizure by malicious prosecution. (*See* Amended Complaint, Doc. No. 72 ¶¶ 72-85). While Howell responds to McCormick's motion for summary judgment as to the merits of this

12

Count, he does not appear to address McCormick's assertions of qualified immunity. (*See* Doc. No. 275 at 24-29). Accordingly, Howell fails to meet his burden of establishing that McCormick is not entitled to qualified immunity as to Count Three. *See Mosier*, 90 F.4th at 546. Therefore, the Officers' motion will be granted as to Count Three on qualified immunity grounds.

### 4. Count Four

In Count Four, Howell claims McCormick, Aldea, and Polk violated his Fifth Amendment rights to remain silent and to not be compelled to be a witness against himself. (*See* Amended Complaint, Doc. No. 72 ¶¶ 86-92). Howell fails to argue against qualified immunity as to McCormick, Aldea, or Polk in his response to their motion for summary judgment as to Count Four. Accordingly, Howell fails to meet his burden of establishing that McCormick, Aldea, and Polk are not entitled to qualified immunity as to Count Four. *See Mosier*, 90 F.4th at 546. Therefore, the Officers' motion will be granted as to Count Four on qualified immunity grounds.

## B. Remaining federal claims against Vaughn

The Court now turns to Vaughn's arguments for summary judgment on Counts Two and Four, on the merits.

### 1. Count Two

In Count Two, Howell claims Vaughn seized his vehicle in violation his Fourth Amendment right to be free from unreasonable seizure of property. (*See* Amended Complaint, Doc. No. 72 ¶¶ 67-71). A seizure results in a constitutional violation only if it is unreasonable. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To prevail in a claim for damages under Section 1983, a plaintiff must show that the defendant was personally involved in the alleged constitutional violations because each defendant's liability must be assessed individually based on his own actions. *See Abu-Joudeh v. Schneider*, 954 F.3d 842, 850 (6th Cir. 2020) (citations omitted); *see*

*also Chaney-Snell v. Young*, 98 F.4th 699, 721 (6th Cir. 2024) ("Section 1983 generally prohibits a plaintiff from holding one officer liable for another's actions."). Thus, to survive summary judgment, a plaintiff must put forward evidence suggesting that the defendant participated in the violation of the plaintiff's constitutional rights, since as a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability. *See id.* Here, Vaughn argues he is entitled to summary judgment on Count Two based on Brown's following deposition testimony:

> Q.     She came back at some point, and do you think you were asleep when she took the car?
>
> A.     No, I was awake when she took the car.
>
> Q.     What happened there? Who –
>
> A.     I know she pushed it out of the driveway somehow. And I don't know what she did with it once she got it to the street, after she got it out of the garage.
>
> Q.     Did you observe Officer Vaughn or any of these officers helping her push that car?
>
> A.     I don't remember. They might – like at one point they were in the garage with her. This was before she had left and while they were still here while I was still – because they had me in cuffs. And they had taken me from where I was outside back inside. And they had said they wanted to keep us separate, you know, in case anything happened, Leila and I.
>
>         So I was in the living room restrained and she was out in the garage. And some of the officers were outside, so I don't know if they had – if there was any cooperation there.
>
> Q.     Did you see any of them help her take that car, yes or no?
>
> A.     No.
>
> Q.     And you didn't have any ownership interest in that vehicle, right?
>
> A.     No, I sure didn't.

(Brown Deposition from February 7, 2017, Doc. No. 254-3 at PageID # 1211-12).

| Q. | When you say there was an issue with the car, you're referring to the Lumina? |
|---|---|
| A. | Yeah. |
| Q. | It was still in the driveway at that time? |
| A. | I don't remember. |
| Q. | You don't remember whether – |
| A. | I don't remember if she got it out, if she had it towed. I don't remember what happened with that. I know she was trying to get it out, but I don't remember exactly what ended up happening with it. |
| Q. | But anyway, you have a recollection at some point, even after the officers had left, the vehicle was still on the premises? |
| A. | Correct. |
| Q. | While she was fooling around, trying to either get the vehicle towed or get it started and whatever she was doing with that, you didn't call any police to say stop her from taking the vehicle, did you? |
| A. | I didn't, no. |

(Brown Deposition from July 15, 2017, Doc. No. 248-2 at PageID # 1134).

In his response, Howell fails to direct the Court to evidence in the record suggesting that Vaughn participated in a seizure of his vehicle. Instead, Howell denies the vehicle was still on the premises after the officers had left (*see* Doc. No. 276 ¶ 25 at PageID # 1544 (citing McCormick Trial Testimony from Feb. 22, 2016, Doc. No. 277-4 at PageID # 1726)). Even viewing the facts in the light most favorable to Howell and drawing all reasonable inferences in his favor, he has failed to create a genuine dispute as to whether Vaughn seized the vehicle in question. Accordingly, the Court finds that Vaughn has demonstrated the absence of any material dispute of fact and that he is entitled to judgment as a matter of law on Count Two.

2.    Count Four

With respect to Count Four, Howell claims Vaughn violated his rights under the Fifth Amendment. A Fifth Amendment violation occurs only if compelled incriminating statements are used against the defendant at trial. *See Peterson v. Heymes*, 931 F.3d 546, 555 (6th Cir. 2019) (citing *Chavez v. Martinez*, 538 U.S. 760, 767 (2003)); *United States v. Verdugo–Urquidez*, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial"); *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985) (the Fifth Amendment prohibits the prosecution's use of compelled testimony in its case in chief). Additionally, the United States Supreme Court has held that a violation of the *Miranda* rules does not provide a basis for a Section 1983 claim. *See Vega v. Tekoh*, 597 U.S. 134, 141-150 (2022).

Here, Howell claims Vaughn violated his Fifth Amendment rights by physically assaulting him in relation for invoking his right to remain silent and by arresting Howell's girlfriend. (Doc. No. 275 at 30). As the challenged conduct does not violate the Fifth Amendment,[2] Vaughn is entitled to summary judgment as to Count Four.

C.    **Municipal Liability**

In Counts One, Two, and Three, Howell and Brown seek to hold Metro liable under Section 1983. A municipality is only liable under Section 1983 "if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom." *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 670 (6th Cir. 2022) (quoting *Slusher v. Carson*, 540 F.3d 449, 456 (6th Cir. 2008)). There are at least four avenues a plaintiff may take to prove the existence of a

---

[2]    The Court has already addressed Plaintiffs' arguments concerning the seizure of Howell.

16

municipality's policy or custom: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Mosier v. Evans*, 90 F.4th 541, 548 (6th Cir. 2024) (citation omitted).

        1.    <u>Count One</u>

            a.    <u>Allegations in the Complaint</u>

In Count One, Howell and Brown claim that MNPD has a policy and practice of officers intruding upon homes without a warrant in the middle of the night and generally failing to train and supervise its officers, including supervisors failing to punish officers who violate the rights of citizens. (*See* Amended Complaint, Doc. No. 72 ¶¶ 48-66). In support, Howell and Brown allege MNPD officers routinely implement "knock-and-talks" under which multiple officers go to the entrance of a house at bothersome hours, in an effort to persuade or intimidate the homeowner into granting consent for entry without having to get a warrant. (*Id*. ¶ 52). The Amended Complaint alleges two examples of MNPD forcibly invading the curtilage of a home at improper hours: (1) the allegedly warrantless seizure of Willie Pointer at his home on April 14, 2011, during a nighttime knock-and-talk, and (2) the allegedly warrantless seizure of David Chase on June 8, 2014. (*Id*. ¶¶ 53, 54).[3]

On the issue of improper supervision, the Amended Complaint alleges, as to Count One, that "supervisors routinely fail to punish officers who violate the rights of citizens – even when those officers commit criminal acts." (*Id*. ¶ 62). The Amended Complaint alleges that, as "just one

---

[3]      Through its motion for summary judgment, Metro submits that the *Chase* case did not involve warrantless entry, warrantless arrest, or warrantless seizure. (Doc. No. 260 at 6 (citing *Chase v. White*, 2016 WL 7210155 (M.D. Tenn. 2016) (granting defendants' motions to dismiss)). Plaintiffs do not argue otherwise or even mention the *Chase* case in their response. (*See* Doc. No. 275).

example," the Internal Affairs division failed to investigate Howell's complaint in this particular case. (*Id*. ¶ 63). The Amended Complaint further alleges that MNPD has an official policy of working hand-in-hand with District Attorney Glenn Funk to shield officers from liability by threatening people with baseless prosecutions. (*Id*. ¶ 65). Additionally, the Amended Complaint alleges that MNPD has frequently allowed officers who committed crimes or serious disciplinary offenses to leave the MNPD in good standing, rather than seeking POST certification. (Doc. No. 72 ¶ 66 (citing Tenn. Code Ann. § 38-8-104(b)-(c); Tenn. Comp. R. & Regs. 1110-02-.04(2)(b)).[4]

b.   <u>Metro's arguments for summary judgment as to Count One</u>

Through its motion for summary judgment on Count One, Metro submits that Howell has not shown that MNPD had a policy and practice to intrude on homes in disregard of the Fourth Amendment curtilage doctrine. (Doc. No. 260 at 6-7). In support, Metro produces evidence of the training that the officers receive. (*See* Christoper Gilder Deposition, Doc. No. 254-8 at PageID # 1267-69, 1270-74, 1280-87; MNPD Manual, Doc. No. 254-9 at PageID # 1299-1300, 1308, 1329, 1336, 1339)). Next, Metro argues Howell and Brown cannot establish that it fails to punish officers because there are systems in place for citizens to file complaints against officers and procedures for investigating those complaints. (*See* Doc. No. 260 at 7 (citing Christoper Gilder Deposition, Doc. No. 254-8)). As for the alleged failure to investigate Howell's complaint, Metro submits there are a myriad of situations where an OPA complaint might be closed and contends there has been

---

[4]      Tennessee Peace Officers Standards and Training Commission ("POST Commission" or "the Commission") is an administrative body established by Tennessee's legislature. *See* Tenn. Code Ann. § 38–8–101, *et seq*. The POST Commission's responsibilities are related to the training and qualifications of law enforcement officers in Tennessee. *See* Tenn. Code Ann. § 38–8–104. The powers and duties of the POST Commission are set out by statute and in the rules promulgated by the Commission, as authorized in the statutes. *See* Tenn. Code Ann. § 38–8–104; POST Commission Rules and Regulations (Tennessee Compiled Rules & Regulations 1110–01–.01, *et seq*.). Under the statutes and the regulations, the POST Commission has the power to deny, suspend, or revoke the certification of law enforcement officers who do not meet the established standards. *See* Tenn. Op. Att'y Gen. No. 00–191, 2000 WL 33115961 (Dec. 20, 2000).

no showing that anything was improper about the OPA investigation. (*See id.*). Additionally, Metro argues it cannot be held liable for the alleged conduct of District Attorney Glen Funk. (*Id.* at 8).[5] With regard to the POST allegations, Metro submits there is no showing of a custom or policy to not notify POST of officer resignations in lieu of terminations. Metro also argues Plaintiffs have failed to show how the alleged POST policy or custom influenced the officers' conduct in this case in anyway. (*Id.* at 8-9).

        c.  <u>Plaintiffs' response</u>

In their response, Plaintiffs contend that Metro is wrong to suggest that they "cannot possibly show that it has any constitutional policies or customs …. because the Complaint alleges improper supervision or training, and the Plaintiffs are in possession of a great deal of facts in that regard." (Doc. No. 275 at 32). According to Plaintiffs, "[t]he specific facts fall into two categories: 1) [Metro] trains its officers that the Fourth Amendment protections for the home are dispensable, and 2) [Metro] routinely protects, rather than punishes, officers who commit wrongdoing." (*Id.*).

As for the first category – defective training/supervision on the Fourth Amendment – Plaintiffs submit that, "[b]asically, Metro Nashville trains its officers that the Fourth Amendment does not really apply to its officers, at least not when it comes to entering people's homes." (Doc. No. 275 at 33). In support, Plaintiffs cite to Sections 15.50.020-F and 5.20.010 of the MNPD manual and excerpts of Polk and McCormick's testimony from Howell's criminal trial about their training. (Doc. No. 275 at 33 (citing Doc. Nos. 277-5; 277-4; 277-9). Plaintiffs argue that "[a]long these same lines, Metro Nashville has a widespread custom of abusing the knock-and-talk power to violate homeowner's rights." (Doc. No. 275 at 34 (citing Amended Complaint, Doc. No. 72 ¶¶ 52, 55)). Plaintiffs submit that "[t]his unconstitutional custom is particularly relevant here because

---

[5]      Plaintiffs do not respond to this argument in their response. (*See* Doc. No. 275).

19

the Officers effectively arrested Plaintiff Howell from the very moment that they laid eyes on him at the front door." (*Id*. at 34). Additionally, Plaintiffs submit that the Officers' "show of force, aggressively summoning him, using multiple officers to confront him at night, followed by pointing at least one gun at him, was not consistent with the Fourth Amendment as interpreted by the Supreme Court in *See Florida v. Jardines*, 133 S. Ct. 1409 (2013)." (*Id*.).[6]

As to the second category – defective supervision/custom of protecting rather than punishing officers who commit wrongdoing – Plaintiffs submit that, "[r]egardless of any training, the Complaint also argues that, whenever Nashville officers violate the law, they are routinely protected rather than disciplined." (Doc. No. 275 at 35). In support, Plaintiffs identify "[a]s one flagrant and notable example," when the Office of Professional Accountability "made only a token effort to investigate" Howell's complaint about the December 2014 incident, "refusing even to interview the witnesses in question before (apparently) exonerating the officers." (*Id*. (citing Howell Declaration, Doc. No. 277-2 ¶ 15)).[7] Plaintiffs submit "[e]vidence at trial will show that the investigation was immediately closed because the OPA spoke with Metro Nashville's attorneys." (Doc. No. 275 at 35 (citing Plaintiffs' manual filing of an Audio CD)). Plaintiffs point to evidence that it is difficult to discipline MNPD officers and that the Nashville Civil Service

---

[6]     Plaintiffs do not bring federal claims of excessive use of force in the present matter.

[7]     Paragraph 15 of Howell's Declaration provides as follows:

> While my criminal trial was pending (but after I filed my lawsuit), my attorney Drew Justice told me that he had received a voicemail from the Office of Professional Accountability about my case. I told him that of course I wanted to speak with them about my grievances, and I told him to let them know that I was available. My understanding is that they never would call him back. Later I found out that they closed the OPA file right after they opened it, and that they closed it after speaking with Metro Legal. They never did interview me about my complaint.

Commission has reversed the chief of police's attempts to discipline officers, on numerous occasions. (Doc. No. 275 at 36 (citing Doc. No. 277-10 at PageID 1813-14)).

Plaintiffs also cite to a MNPD investigation into a 2011 complaint against Detective Polk as evidence of Metro ratifying a false arrest. (Doc. No. 275 at 35-36 (citing MNPD complaint report, Doc. No. 277-12)). According to the MNPD complaint report, an individual complained that Detective Polk "issued her a citation without questioning her first" and "slapped her arm causing bruising and took her to jail without allowing her to receive medical treatment for the injuries." (Doc. No. 277-12 at PageID # 1870). While Plaintiffs contend, without explanation, that "the OPA condoned the false arrest," (*see* Doc. No. 275 at 36), the contents of the complaint report indicate that Polk's supervising officer interviewed the complainant and other fact witnesses, including Polk, before concluding that the complaint was not sustained. (*See* Doc. No. 277-12 at PageID # 1872-76).

Finally, Plaintiffs contend that "Metro Nashville has previously implemented a policy of allowing these rogue officers to resign in good standing, instead of reporting their misdeeds to the state Police Officer Standards and Training (POST) Commission as required by law." (Doc. No. 275 at 26 (citing Disciplinary File Excerpts of Chad Knaggs, Chad Barth, Tyrone Wimberly, Bruce Guldeman, and Mitchell Kizer, Doc. Nos. 277-17, 277-14, 277-18, 277-15, 277-16)). Plaintiffs argue the foregoing practice – allowing officers who committed crimes or serious disciplinary offenses to leave the MNPD in good standing without reporting to the POST Commission – "can be said to be a 'moving force' behind the police misconduct here" because "[a] police officer who can simply cover up his misdeeds in one department, resigning in good standing before going to work at another, has no motivation to obey the law." (Doc. No. 275 at 37).

d.  Metro's reply

As for the allegedly defective training/supervision on the Fourth Amendment, Metro argues in its reply that Detective Polk's testimony about his Fourth Amendment training is insufficient to establish municipal liability here because the Supreme Court has recognized "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." (Doc. No. 285 at 3 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989)). As for Metro's alleged custom of using "knock-and-talks" to persuade or intimidate the homeowner into granting consent for entry without having to get a warrant, (Doc. No. 72 ¶ 52), Metro submits that the incident on December 9, 2014, was not a "knock and talk" because the parties agree that it was a Code 3 response to a domestic disturbance. (*See* Doc. No. 285 at 3-4; Doc. No. 276 ¶¶ 4, 6, 7 at PageID # 1546-47). Accordingly, Metro argues Plaintiffs cannot hold it liable for a policy or custom of illegal "knock-and-talks" because the alleged injury – violation of the Fourth Amendment right to be free from unreasonable searches and seizures – was brought about by a Code 3 response rather than a "knock -and-talk." Additionally, Metro argues the failure to train theory of liability fails on summary judgment because Plaintiffs have not identified more than one instance of a purportedly inappropriate "knock-and-talk."

As for the allegedly defective supervision/custom of protecting rather than punishing officers who commit wrongdoing, in its reply, Metro points to five "Change of Status Forms" sent to the POST Commission notifying it that the five respective officers had been suspended for 30 days. (*See* Doc. No. 285 at 5; Doc. No. 283 ¶¶ 5-9 at PageID # 1958-60 (citing Doc. No. 277-14 at 3; Doc. No. 283-1 at 3-5; Doc. No. 277-15 at 4)). Metro further argues, even though it is difficult

22

to discipline officers, Plaintiffs have not shown that Metro has not pursued discipline when warranted. (Doc. No. 285 at 5).

    e.  <u>Analysis</u>

According to Plaintiffs' response, they pursue two theories of municipal liability for their claimed violations of their Fourth Amendment rights to be free from unreasonable searches and seizures in Count One: 1) failure to train on the Fourth Amendment protections for the home, and 2) failure to supervise/punish officers who commit wrongdoing. (*See* Doc. No. 275 at 32). The Court will address the parties' arguments as to each theory of municipality liability in turn.

    *i.  Failure to Train*

To succeed on a failure to train or supervise claim under Section 1983, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *see, e.g., Harris v. City of Saginaw, Michigan*, 62 F.4th 1028, 1039 (6th Cir. 2023) ("the City's potential liability for failure to supervise… turns on whether the City exhibited deliberate indifference to its citizens' constitutional rights.").[8]

In its motion for summary judgment, Metro challenges Plaintiffs' proof as to the first element – that the training was inadequate for the tasks performed – by producing evidence of the training that it provides to its officers. (*See* Doc. No. 260 at 4-7). Metro also challenges Plaintiffs'

---

[8]     There are two ways to support a claim that a failure to train or supervise is the result of a municipality's deliberate indifference – i.e., element two – a plaintiff may prove (1) a pattern of similar constitutional violations by untrained employees or (2) a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation. *See Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 323 (6th Cir. 2023), cert. denied, 144 S. Ct. 692, 217 L. Ed. 2d 388 (2024) (citing *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015)).

proof as to the second element – that the inadequacy was closely related or actually caused the injury – arguing it cannot be held liable for the alleged policy and practice of abusive "knock-and-talks" because the parties agree that the incident at issue in this case arose from MNPD officers responding to a Code 3 involving a domestic disturbance. (Doc. No. 260 at 5).[9] Stated another way, Metro has produced unrebutted evidence that the alleged policy and practice of abusive "knock-and-talks" was not the moving force behind the alleged constitutional injury in Count One.

In their response, Plaintiffs attempt to create a dispute of material fact as to the first element by pointing to Detective Polk's trial testimony about his training on the Fourth Amendment protections against warrantless entry into homes. (*See* Doc. No. 275 at 33). However, in its reply, Metro asserts that Detective Polk's cited testimony is insufficient to create a genuine dispute of material fact as to the adequacy of Metro's training because, under *City of Canton v. Harris*, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." (Doc. No. 285 at 3 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989)).

As for Metro's challenge to Plaintiffs' ability to meet the second element – that the alleged "knock-and-talk" custom or policy was closely related to or actually caused the constitutional injury – Plaintiffs conclusively respond by stating "[a]ll the aforementioned defective training, custom, and supervision could quite reasonably be called the 'moving force' behind the Fourth Amendment violations here." (Doc. No. 275 at 35). Even viewing the facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, they have failed to

---

[9]     As noted above, the parties agree that MNPD trains its officers on the Fourth Amendment protections for the home, including in the context of domestic violence, (Doc. No. 276 ¶¶ 4-8, 10 at PageID # 1566-69), and that the MNPD officers came to Howell's residence on the night in question on a Code 3 response to a domestic disturbance. (Doc. No. 285 at 3-4; Doc. No. 276 ¶¶ 4, 6, 7 at PageID # 1546-47).

demonstrate a genuine dispute as to whether the alleged "knock-and-talk" custom or policy was closely related to or actually caused the alleged constitutional injury in Count One.

<em>ii. Ratification</em>

To succeed on a "ratification" theory, a plaintiff needs evidence "that an official with final decision-making authority ratified the conduct." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024). "A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020) (citing *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir. 1990)).

In its motion for summary judgment, Metro submits that Plaintiffs cannot establish that it fails to punish officers for alleged misconduct because it produced evidence of the systems in place for citizens to file complaints against officers and procedures for investigating those complaints. (*See* Doc. No. 260 at 7 (citing Christoper Gilder Deposition, Doc. No. 254-8)). In further support, Metro notes that Polk was not punished for the 2011 complaint against him because the investigation exonerated him. (*See* Doc. No. 277-12 at PageID # 1872-76). And as for its alleged policy of not reporting the misdeeds of "rogue" officers to the POST Commission, Metro produces "Change of Status Forms" it sent to the POST Commission notifying the Commission that Chad Knaggs, Chad Barth, Tyrone Wimberly, Bruce Guldeman, and Mitchell Kizer had each been suspended for misconduct. (*See* Doc. No. 285 at 5; Doc. No. 283 ¶¶ 5-9 at PageID # 1958-60 (citing Doc. No. 277-14 at 3; Doc. No. 283-1 at 3-5; Doc. No. 277-15 at 4)). Even viewing the facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, Plaintiffs have failed to create a genuine dispute of material fact as to whether Metro has failed to meaningfully punish allegations of unconstitutional conduct.

25

Plaintiffs also seek to establish municipal liability for Metro's alleged failure to meaningful investigate Howell's complaint of unconstitutional conduct about the present matter. A municipality's ratification of unconstitutional conduct by its employees may take form of failure to investigate if there have been multiple earlier inadequate investigations that concern comparable claims. *Mosier v. Evans*, 90 F.4th 541 (6th Cir. 2024) (inaction can also support municipal liability under Section 1983 when there is a clear and persistent pattern of illegal activity). Here, Plaintiffs have failed to direct the Court to evidence in the record of any earlier inadequate investigations that concern comparable claims. (*See* Doc. No. 275). As such, Plaintiffs have also failed to create a genuine dispute of fact as to whether Metro has failed to meaningfully investigate allegations of unconstitutional misconduct.

For the foregoing reasons, Metro will be granted summary judgment as to Count One.

2.      Count Two

In Count Two, Howell claims that, but for MNPD's failure to supervise its officers, his Fourth Amendment right to be free from unreasonable seizure of property would not have been violated. (*See* Amended Complaint, Doc. No. 72 ¶¶ 67-71). In support of this claim, Howell alleges Metro failed to discipline Defendant McCormick after he was sued in federal court for allegedly having a person's vehicle towed illegally. (*Id*. ¶ 71).

Through its motion for summary judgment, Metro notes that this Court, in *Tuell v. McCormick*, No. 3:14-CV-1834, 2015 WL 4727144 (M.D. Tenn. Aug. 7, 2015), determined that it was a reasonable decision to have the vehicle at issue towed and impounded under the circumstances. (Doc. No. 260 at 9 (citing *Tuell* at *6). Metro submits that McCormick did not deserve to be disciplined for having that person's vehicle towed because the seizure was reasonable. (*See id*.). Howell does not address Metro's argument for summary judgment as to

Count Two in his response. (*See* Doc. No. 275). Accordingly, Metro's motion for summary judgment will be granted as unopposed as to Count Two.

   3.   <u>Count Three</u>

In Count Three, Howell claims that, but for MNPD's failure to supervise its officers, his Fourth Amendment right to be free from malicious prosecution would not have been violated. (Doc. No. 72 ¶ 83). Howell alleges that Metro "fosters a culture of reckless prosecution" by "upon information and belief, … routinely send[ing] officers to procure indictments who have zero knowledge about the cases being prosecuted." (*Id*. ¶ 84). Howell also alleges the Chief of Police for MNPD "specifically assisted the illegal prosecution of [Howell], by filing a motion to illegally quash a subpoena so that the Chief would not have to testify in [Howell]'s defense." (*Id*. ¶ 85).

Metro moves for summary judgment on Count Three on the basis that "Howell has failed to make a showing of a Metro policy or custom that was the moving force behind the alleged malicious prosecution by its officers." (Doc. No. 260 at 10). It argues Howell has not demonstrated any prior instances of malicious prosecution that would lead to Metro being put on notice as to the failure to supervise. (*Id*. at 11). Metro also cites to its policies for review and supervision of prosecutions that may have been mishandled by an officer. (*Id*. at 12). As for the officers who procure indictments, Metro argues Tennessee Code Annotated Section 40-12-104 does not preclude personnel from Case Preparation testifying before the grand jury so long as they have knowledge or proof regarding the criminal offense. (*Id*. at 12). Last, Metro submits (without citation to the record) that the criminal court quashed the subpoena for the Chief of Police and that Howell has not shown any impropriety by Metro or the Chief of Police in seeking to have the subpoena squashed. (*Id*. at 12-13). In his response, Howell does not appear to address Metro's

27

foregoing arguments for summary judgment as to Count Three. Accordingly, Metro's motion for summary judgment will be granted as unopposed as to Count Three.

**D.      State Law Claims**

As the Court will dismiss Plaintiffs' federal claims, it will decline to exercise supplemental jurisdiction over the pendent state-law claims. *See* 28 U.S.C. § 1367(c)(3) (noting that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction"); *see also Hamilton v. Franklin, Tennessee*, 608 F. Supp. 3d 599, 617 (M.D. Tenn. 2022). Further, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Here, the interest of judicial economy weighs against the continued exercise of supplemental jurisdiction because questions remain about whether state law would provide qualified immunity to the individual officer defendants in this matter. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues."). Accordingly, Plaintiffs' state-law claims will be dismissed without prejudice.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiffs' state-law claims will be dismissed without prejudice and Defendants' motions for summary judgment (Doc. Nos. 245, 249, 251, 260) will be granted as to Plaintiffs' federal claims.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE